UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTOINE JACKSON,

        Petitioner,

v.

CASE NO. 10-12426

GREGORY McQUIGGIN,

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

        Respondent.

_____/

**OPINION AND ORDER**
**DENYING THE HABEAS CORPUS PETITION, BUT**
**GRANTING IN PART A CERTIFICATE OF APPEALABILITY**

Pending before the Court is Antoine Jackson's habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's arson conviction on grounds that (1) the trial court deprived Petitioner of a fair trial by failing to keep "junk science" from the jury and (2) defense counsel was ineffective for failing to investigate and present a substantial defense. The state appellate court's rejection of Petitioner's claims was not contrary to, or an reasonable application of, clearly established federal law as determined by the Supreme Court. The Court therefore has no choice but to deny the petition.

## I. Background

Petitioner was charged in Wayne County, Michigan with arson of a dwelling house, Mich. Comp. Laws § 750.72. The charge arose from allegations that Petitioner intentionally set fire to Carrie Wilkinson's two-story apartment in Taylor, Michigan on

March 28, 2006.  Carrie was Petitioner's girlfriend at the time, and the prosecutor's theory was that Petitioner burned Carrie's apartment because she left him on the previous night.  Petitioner was tried before a jury in Wayne County Circuit Court where the following witnesses testified.

<u>Raymond Wlosinski</u>

 Raymond Wlosinski testified that he was a captain and shift commander for the Garden City Fire Department.  He was also a canine handler, and his dog Dakota was trained to identify accelerants.  When Dakota smelled an accelerant, he would sit and look at Wlosinski.

On March 29, 2006, at about 2:30 a.m., Wlosinski and Dakota conducted a search at 16328 Weddel Street in Taylor, Michigan.  During the search, Dakota showed an interest in the left-hand side of the couch in the living room of the apartment.  Dakota looked at Wlosinski, but he did not sit down.  As the search continued, Dakota provided a positive indication of an accelerant at a table opposite the couch.  He sat down and looked at Wlosinski.  When they went back to the couch, Dakota again showed interest, but he did not positively indicate.

On cross-examination, Wlosinski admitted that his report on the search made no mention of Dakota having made a positive indication at the table.  In fact, the report stated that Dakota made no positive indication of accelerants.  On redirect and recross examination, Wlosinski explained that he simply omitted mention of the positive indication in his report and that the omission was not intentional.

2

<u>Michael Kukler</u>

Michael Kukler testified that, on March 28, 2006, he lived next to Carrie Wilkinson at 16326 Weddel Street.  He knew Petitioner as Carrie's boyfriend, and he saw Petitioner going in and out of Carrie's apartment about four times that day.  He saw no one else going or leaving the apartment, and Petitioner left the apartment for the last time between 4:00 and 5:00 p.m.  About 7:00 p.m., Kukler's smoke alarm sounded.  He went upstairs to investigate and saw smoke coming out of his bathroom access panel, which led to the apartment next door where Carrie lived.  He called the fire department.  His neighbor from across the street then came over and said that the apartment next door was on fire.  Kukler went outside and noticed that the kitchen window in Carrie's apartment was smoked up and cracked from the heat.

<u>Thomas Badger</u>

Thomas Badger testified that Carrie Wilkinson was his girlfriend's sister and that both Carrie and Petitioner were friends of his and his girlfriend.  He heard about the fire on the night it happened, and he saw Petitioner three times earlier that day.  The first time was about 3:30 p.m. when Petitioner came over to Badger's house for a few minutes.  Petitioner was fidgety, and he appeared to be "high."

Petitioner returned to Badger's house about 4:30 or 5:00 p.m.  Petitioner asked for a gun and said that "he was going to kill his bitch."  He also said something about Carrie sleeping with another man.  Badger declined Petitioner's request for a gun, and he did not think Petitioner intended to do anything because he had previously said something

3

similar.

About 8:00 p.m., Petitioner came to Badger's house for the third time.  Petitioner asked Badger to call Carrie's mother's house to determine whether Carrie was there. Badger called the house and spoke to both Carrie and her mother, but Petitioner did not want to talk to them, and he left in his truck.

<u>Carrie Wilkinson</u>

Carrie Wilkinson testified that she was living at 16328 Weddel Street in Taylor on March 28, 2006.  Petitioner was her boyfriend at the time.  On the previous night, March 27, 2006, she and Petitioner went out and then returned to her apartment.  Petitioner went upstairs, and she suspected that he was doing drugs because he had been doing drugs all weekend.  Petitioner followed her downstairs and convinced her not to leave.  But when Petitioner went back upstairs, she left the apartment without telling him and ultimately went to her mother's house where she spent the night.  She and her mother received telephone calls from people stating that Petitioner was looking for her.

On Tuesday, March 28, 2006, about 9:30 p.m., Petitioner stopped in front of her mother's house and rammed his truck into her mother's car.  She then called the police and asked them to check her apartment.  About an hour later, the police called and asked her whether she was aware of the fire.  She informed the police that Petitioner had previously threatened to burn the apartment.

On cross-examination, Carrie testified that she smoked at her apartment on the night before the fire and did not clean the ash trays afterward.  She also admitted that she

4

had electrical problems in the apartment. The television kept "shorting out," and the lights would flicker when she and Petitioner used several appliances.

John Hager

John Hager was the fire marshal for Taylor, Michigan. He investigated Carrie Wilkinson's apartment after the fire was extinguished on March 28, 2006. He testified that there was nothing on the gas stove at the apartment and that the fire department had turned off the gas before he inspected the place. However, one of the knobs on the stove was in the "on" position. He ruled out any electrical or mechanical explanation for the fire and ultimately concluded that the fire was intentionally set. According to him, the origin of the fire was on the right side of the couch, and an accelerant was used. The accelerant-sniffing dog walked through the premises and tried to sit on the couch. He could not sit down because there was nothing to sit on except for the springs in the couch, but he continued to look at his handler. The dog alerted to something near the CD case. Hager did not smell gasoline, and he did not see any cigarette butts in the house. He did see a gallon of pink windshield washer solvent in the dining room, but it was unopened.

Hager took four samples of carpeting and submitted them for analysis. The parties stipulated that the results of an analysis of the carpet samples failed to reveal the presence of any ignitable liquids. Hager nevertheless maintained that there were accelerants on the carpet throughout the living room, and he confirmed that the fire department was dispatched at 7:50 p.m. on the day of the fire.

Rosanna Hooper

5

Taylor Police Officer Rosanna Hooper testified that she was dispatched to 16328 Weddel Street on March 28, 2006, at approximately 8:00 p.m.  She was sent there to look for Petitioner in connection with damage to a motor vehicle in Dearborn Heights.  The fire department was present when she arrived at the Weddel Street address.  She then contacted Carrie Wilkinson and told her that her apartment was burned.

Sherrie Wilkerson

Carrie Wilkinson's sister, Sherrie Wilkerson,[1] testified that she saw Petitioner at her boyfriend's house about 3:30 p.m. on March 28, 2006.  She saw him again about 8:00 or 9:00 p.m. at the restaurant where she worked.  He asked her where her sister was, and when she responded that Carrie was at their mother's house, Petitioner asked to use her cell phone.  He left with her phone, and that was the last time she saw him.  He seemed fine, but tired and "a little out of it."

The defense rested without presenting any witnesses, and on August 3, 2006, the jury found Petitioner guilty, as charged, of arson of a dwelling house.  On August 17, 2006, the trial court sentenced Petitioner as a habitual offender, second offense, to imprisonment for seven to twenty years.

Petitioner moved for a new trial, alleging that his attorney was ineffective for

---

[1]  Although the two women were sisters, Carrie's last name is given as "Wilkinson" in the transcript of trial, but Sherrie's last name is typed as "Wilkerson" in the transcript. *Cf.* Trial Tr. vol. 2, 3, 89, Aug. 1, 2006, with Trial Tr. vol. 3, 2, 94, Aug. 2, 2006.  The Court has used the spellings provided in the transcript of trial even though one of them may be incorrect.

failing to demonstrate that the fire marshal did not follow a scientifically-accepted methodology for determining the cause and origins of the fire. The trial court held an evidentiary hearing and denied Petitioner's motion. The Michigan Court of Appeals subsequently affirmed Petitioner's conviction in an unpublished decision, *see People v. Jackson*, No. 272776, 2008 WL 2037805 (Mich. Ct. App. May 13, 2008), and on March 23, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Jackson*, 483 Mich. 912 (2009) (table).

Petitioner filed his habeas corpus petition through counsel on June 21, 2010. He alleges that: (1) the trial court erroneously admitted (a) testimony from an expert witness who failed to adhere to scientifically acceptable techniques and (b) evidence of positive canine alerts; and (2) defense counsel provided ineffective assistance by failing to adequately investigate, prepare, and defend the charge against Petitioner. Respondent argues in an answer to the petition that claim 1(a) is not cognizable on habeas review, that claim 1(b) is procedurally defaulted, and that the state court's decision on claim 2 is not unreasonable.

Procedural default is not a jurisdictional matter, *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005), and it is just as efficient to adjudicate claim 1(b) on the merits as it is to analyze whether the claim is procedurally defaulted. Thus, the alleged procedural deficiency is excused. The Court will proceed to address Petitioner's claims, using the following standard of review.

## II.  Standard of Review

7

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claim "was so lacking in justification that there

8

was an error well understood and comprehended in existing law beyond any possibility
for fairminded disagreement."  *Id*. at 786-87.

## III.  Discussion

### A.  The Evidentiary Claims

Petitioner claims that the trial court prevented him from receiving a fair trial by
abandoning its gatekeeping duty to keep "junk science" from the jury.  According to
Petitioner, the prosecution admitted evidence that did not adhere to the strictures
concerning the presentation of expert testimony as set forth in Michigan Rule of Evidence
702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 590 (1993).

### 1.  Fire Marshal John Hager's Testimony

Before trial, the trial court held a *Daubert* hearing to determine whether the
prosecution was entitled to produce fire marshal John Hager as an expert witness at trial.
Hager testified at the hearing about his investigation of the fire at Carrie Wilkinson's
apartment and his conclusion that the fire was intentionally set.  At the conclusion of the
hearing, the trial court determined that Hager was qualified to testify about the cause and
origin of the fire and that Hager's opinion would be admissible.  (Trial Tr., vol. 1, 160,
July 31, 2006.)

Petitioner contends that the trial court's decision to admit Hager's testimony was
error because Hager failed to adhere to scientifically acceptable techniques.  The
Michigan Court of Appeals adjudicated this claim on the merits and stated that the trial
court had properly concluded Hager's testimony would assist the jury in understanding

the evidence.  The Court of Appeals also determined that Hager's testimony was properly admitted because it met the requirements of Michigan Rule of Evidence 702, which governs the admission of expert testimony.

### a. *Daubert* **and Michigan Rule of Evidence 702**

Petitioner relies on *Daubert*, in which the Supreme Court stated that, "[f]aced with a proffer of expert scientific testimony, . . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.  In making this determination, courts should consider:  (1) whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be properly applied to the facts; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the technique has widespread acceptance.  *Id*. at 592-94.

Petitioner contends that fire marshal John Hager's testimony failed to satisfy at least three of these factors and that the trial court, as gatekeeper, should have excluded Hager's testimony in light of the serious methodological issues presented by his testimony.  *Daubert*, however, concerned the Federal Rules of Evidence which are not relevant to Petitioner's state conviction. *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998).  Petitioner's additional argument that the trial court, with the endorsement of the Michigan Court of Appeals, violated Michigan Rule of Evidence 702 lacks merit because "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497

10

U.S. 764, 780 (1990).

### b. Whether Hager's testimony was Fundamentally Unfair

Petitioner also contends that it was fundamentally unfair and a violation of his right to a fair trial to admit John Hager's testimony. Errors in the application of state law, especially state court rulings on the admission or exclusion of evidence, generally may not be questioned in a federal habeas corpus proceeding. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). Habeas relief is warranted only if a state court's evidentiary ruling was so egregious that it resulted in a denial of fundamental fairness and thus violated the petitioner's right to due process. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Fire marshal John Hager was a state-certified fire fighter and inspector who was working on a fire science degree at Wayne County Community College at the time of Petitioner's trial. He was also a member of several fire inspector organizations, and he had been involved in 150 to 200 fires as an investigator. He had testified in court five or six times and been qualified as an expert witness two times. (Trial Tr. vol. 2, 125-31, Aug. 1, 2006.) As further explained by the Michigan Court of Appeals,

> Hager testified regarding the manner in which a fire spreads; abnormal burn patterns and what they signify, and the way in which fire damage can be assessed to determine the cause and origin of a fire. Hager opined that the abnormal burn patterns on the floor of Wilkinson's apartment were highly suggestive of the presence of an accelerant. He further indicated that the fact that a burner on the stove was left on, with no cookware on or around the stove, caused him to believe that the burner was left on intentionally to act as an additional accelerant. Hager maintained that he based his fire investigation methodology on the National Fire

11

Protection Association 921 (NFPA 921), a nationally recognized guideline for fire investigation.

*Jackson*, 2008 WL 2037805, at *1.  The Court of Appeals went to say that,

> [c]ontrary to defendant's assertion, the fact that the investigative method Hager implemented is not a carbon copy of the NFPA 921 and is not peer-reviewed does not suggest that his methodology deviated from recognized fire investigation procedures in a sufficiently significant manner to render his findings unreliable.  Hager's methodology appeared reasonable and was by and large in keeping with the guidelines recommended by NFPA 921.  Where Hager deviated from NFPA 921, such deviation is not dispositive because NFPA 921 expressly provides that it contains only nonmandatory provisions; it merely sets guidelines and recommendations for fire investigations, not requirements.[2]  Further, contrary to defendant's contention, NFPA 921 § 1.3 specifically indicates, "[d]eviations from these procedures, however, are not necessarily wrong or inferior but need to be justified."  Hager's theory that the fire was intentionally set with an accelerant is based on sufficient evidence that Hager reasonably applied to recognized and reliable fire investigation principles and methods based on NFPA 921. Although Hager's testimony was vulnerable to criticism because it was contrary to laboratory results indicating the absence of an accelerant, this discrepancy did not render it inadmissible.  Such criticisms go to the weight rather than the admissibility of the testimony.  *People v. Fletcher*, 260 Mich. App. 531, 561, 679 N.W.2d 127 (2004).

*Id*. (footnote in original).

For the reasons given by the Michigan Court of Appeals and in light of Hager's credentials, it was not fundamentally unfair to admit Hager's testimony.  Thus, Petitioner's right to due process was not violated by the trial court's decision to admit the testimony.

## 2.  The Canine Alert

---

[2]  NFPA 921 §§ 1.2.1, 1.3 and 3.2.

Petitioner contends that the trial court also erroneously admitted Captain Raymond Wlosinski's testimony regarding the presence of accelerants in the apartment.  Petitioner alleges that canine alerts are inherently unreliable and that the dog's indications in this case were contrary to objective scientific evidence from the state police crime lab.

The Michigan Court of Appeals reviewed this claim for "plain error" because it was not preserved for appellate review.  The Court of Appeals then determined that Petitioner's understanding of the law was overly broad and that it misrepresented the status of the law in Michigan.  The Court of Appeals also stated that, even if admission of Wlosinski's testimony was improper, Petitioner had failed to establish that the error was outcome-determinative in light of the evidence against him.

In Michigan, canine-detection evidence, by itself, is not sufficient to support a state conviction, but the presence of corroborating evidence can provide the necessary indicia of reliability for admission of the evidence.  *People v. McPherson*, 85 Mich. App. 341, 346 (1978).  The following corroborating evidence existed in this case:  fire marshal John Hager's testimony regarding the use of an accelerant; the absence of an electrical, mechanical, or other explanation for the fire; Petitioner's prior threat to burn the place; and the fact that he was the last person seen leaving the apartment before the fire was detected.

Furthermore, Captain Wlosinski was a certified canine handler who had received specialized training with his dog, Dakota.  Following that training, Wlosinski received over a hundred hours of instruction in the detection of accelerants.  Dakota was trained to

13

detect up to fourteen types of accelerants, and he, too, was certified.  (Trial Tr., vol. 2, 16-20, Aug. 1, 2006.)  In light of this training and certification and the corroborating evidence, it was not an abuse of discretion to admit testimony that Dakota had alerted to the presence of an accelerant.  *Babick v. Berghuis*, 620 F.3d 571, 577 (6th Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 2121 (2011); *United States v. Hildenbrandt*, 207 F. App'x 50, 52 (2d Cir. 2006).

The Court therefore concludes that it was not fundamentally unfair, nor a violation of due process, to admit Captain Wlosinski's testimony about the canine Dakota's reactions during the investigation of the fire.  Petitioner has no right to relief on the basis of claim 1(b).

## B.  Trial Counsel

The second and final habeas claim alleges that Petitioner's trial attorney provided ineffective assistance by failing to adequately investigate, prepare, and defend the charge against Petitioner.  Petitioner maintains that his trial attorney should have retained an expert witness to refute John Hager's testimony that the fire was the result of arson. According to Petitioner, a defense expert witness would have undermined Hager's conclusions and methodology and would have supported the presumption in Michigan that fires are accidental.

The Michigan Court of Appeals determined on review of this claim that trial counsel's decision not to obtain an expert witness was reasonable trial strategy, which it would not second-guess.  The Court of Appeals also stated that, even assuming trial

14

counsel erred by engaging in insufficient cross-examination of Hager, either at the

*Daubert* hearing or at trial, Petitioner could not establish prejudice because Petitioner's

> proposed fire expert could not rule out arson and the prosecution made an
> offer of proof that its fire expert would have testified that Hager's
> methodology and conclusions were sound and reliable.  Furthermore, there
> existed substantial circumstantial evidence against defendant.

*Jackson*, 2008 WL 2037805, at *6.

### 1.  Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984),

is clearly established federal law for purposes of evaluating a claim of ineffective

assistance of counsel.  *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011).

Pursuant to *Strickland*, Petitioner must demonstrate that his attorney's "performance was

deficient" and "that the deficient performance prejudiced the defense."  *Strickland,* 466

U.S. at 687.

"[T]he proper standard for attorney performance is that of reasonably effective

assistance."  *Id.*  To prevail on his claim, Petitioner must show that his attorney's

"representation fell below an objective standard of reasonableness."  *Id.* at 688.  Because

of the difficulties inherent in evaluating an attorney's performance, "a court must indulge

a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under

the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at

689 (quoting *Michel v. Louisiana*, 350 U.S. 91,101 (1955)).

15

To demonstrate that counsel's performance prejudiced the defense, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* at 788.

## 2.  Application

### a.  The Post-Conviction Hearing

The trial court held a post-conviction hearing in this case to determine whether Petitioner's trial attorney was ineffective for failing to call an expert witness.  Petitioner's trial attorney testified at the hearing that she contacted an expert witness, but did not ask him about testifying at trial.  Her opinion at the time was that the case was clear cut, because the Michigan State lab report indicated that there were no accelerants in the area where fire marshal John Hager said the fire originated, and the report on the canine search indicated that the dog did not alert to accelerants in that area.  Consequently, she saw no need to call an expert.  She had concluded that a defense expert might cloud the record or

16

confuse the jury.  She also thought that juries tend to believe prosecution experts and to assume that defense attorneys pay their experts to say something different from the prosecution's expert.  She discussed the matter with Petitioner, and Petitioner agreed to waive an expert witness.

The other witness at the hearing was Dennis Smith, who testified as an expert on arson investigations and on the peer review protocol known as NFPA 921.  According to Mr. Smith, fire marshal John Hager's investigation of the fire in this case was not consistent with NFPA 921 in several ways.  Mr. Smith also testified that there was no physical evidence to support the conclusion that the fire was intentionally started.  He conceded, however, that the fire could have been started deliberately without an accelerant.

The prosecutor claimed that, if he were to call an expert witness, the witness would testify that John Hager's conclusion (that an accelerant was used) was a legitimate conclusion because of the way the carpet burned.  The prosecution expert also would have testified that, although Hager erred by hosing down the floor before taking samples, in all other respects, Hager's methodology of working from the least damaged area to the most damaged area followed NFPA 921.

The trial court stated at the conclusion of the hearing that Petitioner's attorney could have engaged the services of an expert such as Mr. Smith at the *Daubert* hearing, but the court would have allowed Hager to testify at trial anyway.  The court went on to say that the criticisms leveled against Hager's testimony and methodology would have

17

gone more to the weight of the evidence than its admissibility.  And, according to the trial court, if defense counsel had presented a witness such as Mr. Smith at trial, the people would have produced a rebuttal witness, and the trial would have been a battle of the experts.  The trial court opined that, even if the jurors had concluded that the fire was not started with accelerants, they could have reasoned that the fire was deliberately set.  The trial court concluded that the result of the trial would not have been different had trial counsel employed the use of a defense expert.

### b.  Analysis

This Court agrees that trial counsel could have presented an expert witness to support Petitioner's defense that the fire was not the result of arson.  But the state police report and Captain Wlosinski's report indicated that there was no evidence of an accelerant.  Evidence that Captain Wlosinski's dog Dakota alerted to the presence of accelerants unexpectedly came to light during the trial.  Captain Wlosinski explained that Dakota alerted to the presence of an accelerant, but that he neglected to mention the dog's alert when he wrote his report.  (Trial Tr. vol. 2, 23, 29, 34–35, 39-40, Aug. 1, 2006.) Fire marshal John Hager testified that the canine tried to sit on the couch, but was unable to do so because there was nothing but springs for the canine to sit on.  (Trial Tr. vol. 3, 42-44, Aug. 2, 2006.)

Given the lack of evidence before trial that an accelerant was used, it was reasonable for trial counsel to conclude that the prosecution would not be able to prove the fire was the result of arson and that a defense expert was unnecessary.  "Just as there

18

is no expectation that competent counsel will be a flawless strategist or tactician, an

attorney may not be faulted for a reasonable miscalculation or lack of foresight or for

failing to prepare for what appear to be remote possibilities." *Richter*, 131 S.Ct. at 791.

Furthermore,

> [i]n many instances cross-examination will be sufficient to expose
> defects in an expert's presentation. When defense counsel does not have a
> solid case, the best strategy can be to say that there is too much doubt about
> the State's theory for a jury to convict. And while in some instances "even
> an isolated error" can support an ineffective-assistance claim if it is
> "sufficiently egregious and prejudicial," *Murray v. Carrier*, 477 U.S. 478,
> 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), it is difficult to establish
> ineffective assistance when counsel's overall performance indicates active
> and capable advocacy.

*Id.*

In this case, trial counsel elicited testimony that fire marshal John Hager did not

smell gasoline at the site of the fire and did not see any gasoline cans, paint thinners,

ignition devices, or other suspicious items in the apartment. Trial counsel also elicited

testimony that the burn pattern on the floor could have been caused by something other

than an accelerant and that Hager did not check with the police to determine whether

Petitioner had sustained any burn injuries even though that is a common indicator of

arson. (Trial Tr. vol. 3, 46-47, 55-57, 84, Aug. 3, 2006.)

Trial counsel's overall performance indicates active and capable advocacy. Her

cross-examination of Hager exposed weaknesses in Hager's presentation, and there was a

possibility that testimony from a defense expert would have "shift[ed] attention to

esoteric matters of forensic science, distract[ed] the jury . . . , or transform[ed] the case

19

into a battle of the experts."  *Richter*, 131 S. Ct. at 790.

Even if trial counsel's performance were deficient, Petitioner cannot show that he was prejudiced by the deficient performance.  The trial court stated that it would have allowed Hager to testify even if trial counsel had presented an expert witness at the *Daubert* hearing.  And, at trial, the jurors could have concluded from all the evidence that Petitioner started the fire even if they did not believe he used an accelerant.  As previously noted, there was evidence that

> [t]he night before the fire, defendant and Wilkinson argued and Wilkinson left the apartment and did not return.  During the next 24 hours, defendant doggedly pursued Wilkinson, calling various people in an effort to find her, telling his friend that Wilkinson was sleeping with another man and asking his friend for a gun so he can "kill my bitch," and ramming his car into Wilkinson's mother's car while she was . . . in her mother's house. Wilkinson testified that defendant had previously threatened to burn down her apartment.  Approximately two hours after defendant left the apartment the fire was detected.  Defendant was the only person other than Wilkinson with a key to the apartment, and he was the last and only person seen leaving the apartment before the fire.  Hager's investigation revealed that one of the gas burners on the stove was left on, contributing to the fire.

*Jackson*, 2008 WL 2037805, at *3.

The Michigan Court of Appeals concluded that, "even without the canine detection testimony, there was sufficient evidence to convict defendant of arson."  *Id*.  This Court agrees that, in light of all the evidence against Petitioner, there is not a substantial likelihood the result of the trial would have been different had trial counsel presented an expert witness to refute Hager's testimony.  Thus, Petitioner has failed to show that his trial attorney's allegedly deficient performance prejudiced the defense.

Finally, even if the Court had concluded that trial counsel was ineffective, it is at least debatable whether trial counsel's failure to produce an expert witness "was so fundamental as to call the fairness of the trial into doubt." *Richter*, 131 S. Ct. at 791. Therefore, the state court's conclusion that trial counsel was not ineffective was reasonable, and, given the deference due under § 2254(d) and *Strickland*, Petitioner is not entitled to habeas corpus relief on his ineffective-assistance-of-counsel claim.

### IV.  Conclusion

The state courts' rejection of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Accordingly, the petition for writ of habeas corpus [dkt. #1] is **DENIED**.

### V.  Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate

21

that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Reasonable jurists would not disagree with the Court's resolution of Petitioner's first claim regarding the trial court's admission of evidence, but reasonable jurists could debate the Court's resolution of Petitioner's claim about his trial attorney. Consequently, the Court grants a certificate of appealability on habeas claim 2, but denies a certificate of appealability on habeas claim 1(a) and 1(b).

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  November 6, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 6, 2012.

S/Denise Goodine
Case Manager

22